(159 App. Div. 213.)

### ARMOUR v. SOUND SHORE FRONT IMPROVEMENT CO.

(Supreme Court, Appellate Division, First Department.  November 21, 1913.)

1. VENDOR AND PURCHASER (§ 338*)—RECOVERY OF EXCESS PAYMENT—MISTAKE
     —QUANTITY OF LAND—MONEY RECEIVED.
     Where plaintiff contracted to purchase certain land at a specified price
     per acre, the quantity to be determined by a survey, and both parties were
     mistaken as to the consideration for the transfer because of an error by
     the surveyor in locating the high-water mark in front of the premises,
     so that plaintiff paid for 2.521 acres more than he actually obtained, he
     was entitled to recover such overpayment, in an action for money had and
     received, as on an implied promise.
     [Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§
     991–993;  Dec. Dig. § 338.*]

2. VENDOR AND PURCHASER (§ 163*)—CONSIDERATION—DETERMINATION—QUAN-
     TITY OF LAND.
     Where a contract for the sale of land provided that the consideration
     should be determined by a survey, and a particular surveyor was agreed
     on to make the survey, he was not an arbitrator or referee in the sense
     that, in the absence of fraud, his decision as to the quantity of land was
     conclusive on the parties;  his duty being merely ministerial in charac-
     ter.
     [Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §
     327;  Dec. Dig. § 163.*]

3. NAVIGABLE WATERS (§ 36*)—RIPARIAN RIGHTS—EXTENT.
     The title of owners of land bounded by the sea, or by navigable wa-
     ters where the tide ebbs and flows, extends only to ordinary high-water
     mark.
     [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–
     200;  Dec. Dig. § 36.*]

Appeal from Trial Term, New York County.

Action for money had and received by J. Ogden Armour against
the Sound Shore Front Improvement Company.  From a judgment
for plaintiff for $19,202.14, and from an order denying defendant's
motion for a new trial, it appeals.  Affirmed.

See, also, 154 App. Div. 934, 139 N. Y. Supp. 1115.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGH-
LIN, CLARKE, and SCOTT, JJ.

J. Aspinwall Hodge, of New York City (Alexander Holtzhoff and
Frank C. McKinney, both of New York City, on the brief), for appel-
lant.

Breed, Abbott & Morgan, of New York City (Henry H. Abbott, of
New York City, of counsel, and Herbert William Smith, of Islip, on
the brief), for respondent.

CLARKE, J.  On the 4th of October, 1909, the plaintiff, through
an agent, entered into a written agreement with the defendant by
which the defendant agreed to sell and the plaintiff to purchase a tract
of land located at Carteret, in the township of Woodbridge, Middle-

sex county, N. J. The boundary as set forth, so far as material is as follows:

"Beginning at a point in the waters of Staten Island Sound measured at right angles 300 feet southerly from the Arrowsmith line and running along said waterway of Staten Island Sound * * * the exact amount of said acreage to be determined by the official surveyor of the New Jersey Title Guarantee & Trust Company at the time of the passing of this title, and to be paid for at the rate of $7,000 per acre. It is further understood and agreed between the parties hereto, that the party of the first part will, at his own cost and expense, within thirty days from the passing of the title, cause to be conveyed to the party of the second part the riparian grant in front of said property for a distance of 487½ feet, which deed is such a deed as is made by the state of New Jersey for riparian grants. The party of the first part agrees to furnish a deed for the upland, free of incumbrance, the title to be passed * * * on or before the 8th day of October, next."

On October 8, 1909, the defendant executed a deed conveying the premises to the plaintiff, the description reading as follows:

"Beginning at a stake in the easterly right of way line of the New Jersey Terminal Railroad Co., said stake being distant southwesterly 40 feet measured along the easterly right of way line of the New Jersey Terminal Railroad Co. from a point where the southerly line of the property owned by the United States Metals Refining Company, formerly Arrowsmith, if produced westerly would intersect the easterly right of way line of the New Jersey Terminal Railroad; thence along line of lands to be conveyed to the United States Metals Refining Co. S. 1°, 24' E. 402 5/10 feet to an iron pipe, 300 feet from the southerly line of lands formerly of Arrowsmith and measured at right angles thereto; thence still along the southerly line of lands to be conveyed to the United States Metals Refining Co., parallel with and distant southerly 300 feet from the southerly line of lands of the United States Metals Refining Co. formerly Arrowsmith, S. 55°, 14' E. 1606 feet to the high water line of Staten Island Sound; thence southwesterly along the high water line of Staten Island Sound 487 5/10 feet more or less to corner, said corner being 487 5/10 feet measured southwesterly at right angles from the southerly line of lands to be conveyed to the United States Metals Refining Co. or southerly 787 5/10 feet measured at right angles from said Arrowsmith's southerly line; thence through lands of the Sound Shore Front Improvement Co. N. 48° 28' W., 1591 feet to a gas pipe driven in the ground, said pipe being 300 feet southerly from the southerly line of lands to be conveyed to the United States Metals Refining Co., and measured at right angles thereto, also 600 feet from the southerly line of the Arrowsmith tract measured at right angles thereto; thence through lands of the Sound Shore Front Improvement Co. N. 17° 05', W. 538 4/10 feet to stake in the easterly line of way line of the New Jersey Terminal Railroad Co.; thence northeasterly along the easterly right of way line of the New Jersey Terminal Railway Co. along a line curving to the left with a radius of 1221 feet for a distance of 260 feet to the place of beginning. Containing 17.02 acres more or less. Together with all the right, title and interest which the party of the first part now has or may hereafter acquire in the land below high water line and under water of Staten Island Sound in front of and adjacent to the premises hereinabove described and hereby conveyed, and the party of the first part warrants that it has made no other conveyances or incumbrances whatsoever affecting said land under water as aforesaid."

On the same day this further agreement was entered into between the parties:

"In consideration of the payment of the consideration of $7,000 per acre for the land mentioned and described in the contract of sale entered into between the Sound Shore Front Improvement Company and Elisha E. Chandler, acting for J. Ogden Armour, dated the 4th day of October 1909, and the passing of the title on this date, it is mutually agreed between the parties that there

shall be deducted from the amount of said consideration the sum of $12,000, which said sum of $12,000 shall remain in the custody or under the control of J. Ogden Armour for thirty days from the date hereof, unless the said party of the first part shall sooner be prepared to deliver to the party of the second part a deed from the state of New Jersey, through its Riparian Commission for the land under water between high and low water mark and to the riparian line as fixed by the Riparian Commission in front of the premises to be conveyed, as provided in said agreement, to wit, for a width of 487½ feet, more or less, and upon the delivery of said deed said party of the second part hereby agrees to pay over to the party of the first part said sum of $12,000 above mentioned."

The complaint alleges that prior to the passing of title as provided in said contract, the parties thereto agreed to employ one Franklin Marsh, a surveyor, to make the survey of said property to determine the acreage, and said Marsh did accordingly survey said property and prepare a map showing the courses and length of the respective boundary lines thereof; and said Franklin Marsh certified on said map that said property contained 17.02 acres. This allegation is admitted by the answer.

The complaint further alleges:

"In said deed, Exhibit B, delivered by defendant to plaintiff as aforesaid, the northerly line of said property is described as running from a certain iron pipe 1,606 feet to the high-water line of Staten Island Sound, and the southerly line of said property is described as running from a point in the high-water line of Staten Island Sound 1,591 feet to a certain gas pipe driven in the ground, which are the distances said lines are indicated as extending on said map made by said Franklin Marsh, and plaintiff paid the sums mentioned aforesaid for said property, and defendant accepted such payment in reliance upon and believing that said survey by said Franklin Marsh was correct, that said northerly and southerly lines extended for the distances stated in said deed, and that said property contained 17.02 acres of land above the high-water line of Staten Island Sound, and that payment was being made for the upland conveyed at the rate of $7,000 per acre."

These allegations are admitted by the answer.

The complaint further alleges that the riparian grant alluded to in the deed was made to plaintiff by the state of New Jersey, and that the total amount paid by him under the contract and agreement and deed was $119,140, which is at the rate of $7,000 per acre for 17.02 acres. This is also admitted by the answer. The complaint further alleges that subsequently to accepting said deed and paying for said property, plaintiff learned, and the facts are, that the northerly line of said property, instead of extending 1,606 feet from said certain iron pipe to the high-water line of Staten Island Sound, in truth extends but 1,384.4 feet, and that the southerly line of said property, instead of running from a point in a high-water line of Staten Island Sound 1,591 feet to said certain gas pipe driven in the ground, in truth runs but 1,348.94 feet, and that the survey made by the said Franklin Marsh was erroneous and incorrect in said particulars, and that the number of acres conveyed by defendant to plaintiff by said deed, Exhibit B, was in fact but 14.499 acres, instead of 17.02 acres; that, by reason of relying upon the said erroneous survey, plaintiff paid to the defendant, by mistake, at the rate of $7,000 per acre for 2.521 acres of land more than was contained in the property to which he obtained title

under deed, Exhibit B; by reason of such overpayment defendant is indebted to plaintiff in the sum of $17,647, payment of which was duly demanded and refused, with interest from the 1st day of October, 1909, and for which he demands judgment.

It is quite clear, reading these documents contemporaneously executed, that what the parties had in mind was solely the purchase and sale of upland which was to be paid for at $7,000 per acre. The deed was passed and the money paid in the mutual belief that, as matter of fact, there were 17.02 acres of upland in the tract. The answer expressly admits the allegations contained in paragraph 7 of the complaint, among which are the following:

"Plaintiff paid the sums mentioned aforesaid for said property, and defendant accepted such payment in reliance upon, and believing that said survey by said Franklin Marsh was correct, that said northerly and southerly lines extended for the distances stated in said deed, and that said property contained 17.02 acres above the high-water line of Staten Island Sound, and that payment was being made for the upland conveyed at the rate of $7,000 per acre."

[1] If, then, both parties were mistaken, and the survey was erroneous and the high-water mark had been wrongly located, and there were as matter of fact only 14.499 acres of upland in the parcel, the plaintiff has a clear right of action to recover back the overpayment in an action for money had and received to the plaintiff's use. Three separate defenses originally set up by the defendant were demurred to by the plaintiff as insufficient in law. The Special Term sustained the complaint, and struck out these defenses (71 Misc. Rep. 253, 128 N. Y. Supp. 331), and on appeal to this court this decision was affirmed on the opinion below (144 App. Div. 928, 129 N. Y. Supp. 1112). In that opinion it was said:

"Where money is paid under mutual mistake of fact, it may be recovered after demand in an action for money had and received. While proceeding on equitable principles, this is a common-law action. Weston v. Brown, 158 N. Y. 360 [53 N. E. 36] ' * * * Money in the hands of one person, to which another is equitably entitled, may be recovered in a common-law action by the equitable owner upon an implied promise, arising from the duty of the person in possession to account for and pay over the same to the person beneficially entitled.' Robert v. Ely, 113 N. Y. 128, 131, 20 N. E. 606. The law 'implies a contract on the part of the plaintiff to repay it to the party from whom he had wrongfully obtained it.' Andrews v. Artisans' Bank, 26 N. Y. 298, 301. * * * The money was paid in New York, demanded in New York, and refused in New York. The cause of action, therefore, arose in this state. It is based not on the mistake of the surveyor, but on the mistake of the parties in relying on that survey as to the amount of land conveyed, and that mistake was made at the place where the money was paid and the deed accepted. The object of the action is not to affect the title to real estate but to recover money."

George v. Tallman, 5 Lans. 392, was an action to recover the amount of an overpayment upon a contract for the sale of real estate. Defendant contracted to sell a parcel of land to plaintiff, the quantity and particular description of which were unknown to him, by a written contract, for the sum of $40 an acre, subject to measurements; in pursuance of said contract defendant caused said land to be surveyed by a professional land surveyor. By the survey the quantity of land contracted to be conveyed by said contract appeared to be 41.27 acres.

Relying on the accuracy of said survey, and in ignorance of any mistake or error therein, the plaintiff paid for the 41.27 acres at the rate of $40 per acre. Defendant gave a full covenant warranty deed to his agent to deliver to plaintiff on final payment, containing a description according to said survey, and stating the number of acres at 41.27, more or less, and reciting the gross consideration of $1,650.86. On payment of the last installment of the purchase money defendant's agent tendered said deed to plaintiff, but he refused to accept the same on the ground it did not comply with the contract. Afterward the plaintiff, being in possession of said premises under said contract, conveyed by warranty deed to one Rau the deed containing the description according to said survey, and conveying the land as 41.27 acres more or less. This deed was delivered to Rau, who entered into possession. Afterward said land was surveyed by another surveyor at the request of plaintiff and said Rau, and a different description given by him of the land, stated by him to contain 31.97 acres only. After said survey plaintiff and his wife executed and delivered to said Rau another deed, dated as of the date of his former deed, containing a description according to the last survey, and intended to be an amended or substituted deed for the former deed, which had not been recorded. After said survey plaintiff caused a full covenant deed to be drawn in form of a conveyance of said land by defendant to plaintiff, containing a description of said land according to the last-mentioned survey, and reciting the consideration at $1,278.80, and that the land contains 31.97 acres, and being without the qualification "more or less," and caused the same to be tendered to the defendant, with a demand that he execute the same. Defendant refused to execute said deed, or any other, except the one originally tendered to plaintiff. The deed tendered to defendant to be executed contained a correct description. The overpayment in consequence of the original error amounted to $372, which defendant had refused to pay. Johnson, J.:

"Upon the facts found by the referee, which seem to be abundantly supported by the evidence, this is a plain case of money paid by the plaintiff under a mistake in regard to a material fact. In every such case the law gives the party so paying a remedy by action, to recover back the money, as money had and received by the defendant to and for the use of the plaintiff. As the party who thus receives money cannot, in equity and good conscience, retain it, the law presumes a promise on his part to pay it over to the party justly entitled to it, and establishes a privity between them as matter of law. The principle is elementary. Bank of Commerce v. Union Bank, 3 N. Y. 230; Boyer v. Pack, 2 Denio, 107; Burr v. Veeder, 3 Wend. 412; Wheadon v. Olds, 20 Wend. 174, 176; Mowatt v. Wright, 1 Wend. 360 [19 Am. Dec. 508]; Canal Bank v. Bank of Albany, 1 Hill, 287. What the defendant was legally entitled to receive, under his contract with the plaintiff, was the sum of $40 per acre for each and every acre contained in the lots mentioned and described in the contract, the number of acres to be ascertained by an accurate survey and measurement of the lots thus described. The surveyor, selected by the parties to survey, measured, and ascertained the number of acres, made a mistake, either in his measurement or computation afterward, and reported to the parties that the lots contained 9.31 acres more than were actually contained therein. The plaintiff and defendant, both supposing and believing the survey and statement of the surveyor so chosen to be correct, acted upon it, and the plaintiff paid and the defendant received the sum of $40 per acre for the entire quantity thus ascertained and reported by such surveyor. Both

acted in good faith at the time, and were equally ignorant of the mistake made by their surveyor. The mistake was discovered afterward, and the overpayment then became money due from the defendant to the plaintiff, by operation of law, and the relation of debtor and creditor was established. The mistake was made by the surveyor; but he misled the parties. They acted under the supposition and belief that he had made no mistake. His mistake thus became their mistake. In this respect the case is quite analogous to that of Boyer v. Pack, supra, where a third person had been employed to cast interest upon an obligation due, and payment had been made according to his computation, upon the supposition and belief that the computation had been made upon correct principles."

In Graves v. Brinkerhoff, 4 Hun, 305, in March, 1867, defendant made an oral agreement with the plaintiffs for the purchase of a piece of land. The quantity thereof was unknown. The price agreed upon was $115 per acre. Pursuant to such agreement the land was surveyed and a map thereof made. After the survey was made and a map thereof furnished, a written agreement was entered into in and by which the parties undertook to ratify their previous oral agreement for the purchase and sale of said land. In this agreement the description was copied from the surveyor's map and the figures thereon. The contract was executed by the delivery of said deed, the payment of a portion of said moneys mentioned in the contract, and by execution and delivery to the defendant of a bond and mortgage for the balance. Plaintiffs and defendant supposed the number of acres mentioned in the contract and deed to be correct, and never knew of the mistake until the latter part of the year 1873, when the plaintiffs had occasion to have a portion of the lands resurveyed, and then it was for the first time discovered that instead of 41.84 acres, as set out in the contract, the land sold by the defendant measured but 37.41 acres, of all of which the plaintiffs immediately informed the defendant and demanded the difference of him, with interest, which he declined to pay over, except upon the judgment of the court. The mistake between the parties to the submission was mutual. Plaintiffs overpaid through said mistake the sum of $391. Gilbert, J.:

"As a rule, where a person by a mistake of fact pays money to another which he does not owe him, the law implies a promise to repay it. Wheadon v. Olds, 20 Wend. 174. Whether in a case like this, where the mistake occurred in paying the purchase money of lands, and the purchase has been consummated by a conveyance, the remedy can be pursued in an action at law, or must be sought in a court of equity, is not material to inquire; for, upon a submission of a controversy pursuant to section 372 of the Code, the court is bound to give such judgment as the facts require, whether the relief be legal or equitable. The facts in this case clearly entitle the plaintiffs to a return of the sum claimed. It is a case of a plain mistake, and one which must be deemed material."

Wilson v. Randall, 67 N. Y. 338, was an action to recover a sum alleged to have been overpaid by mistake upon the purchase of a piece of land. The parties agreed upon the boundary lines and upon the price per acre, and a survey thereof to ascertain the quantity was to be made by defendant. A surveyor was agreed upon; he made the survey, and reported that there were 54.15 acres within the boundaries agreed upon. A written contract was accordingly executed, in which, after description of the land by metes and bounds, was the following:

"Containing 54 and $15/100$ of an acre, be the same more or less, for the sum of $350, which the said party of the second part agrees to pay," etc.

In pursuance of the contract a deed was executed and delivered. It was dicovered that there was in fact but 48.47 acres of land. Andrews, J.:

"It was found by the court as a fact, and the oral testimony of the negotiations prior to the execution of the contract of sale leaves no room for doubt, that the intention of both parties was that the purchase and sale of the land should be by the acre, and that the amount of the purchase money should be computed on the actual quantity of the land by measurement at the price of $350 an acre. * * * The sale by the acre was the basis of the contract, and while both parties assented to a survey to ascertain the quantity, there was no suggestion that either was to be bound by the survey, and still less that the purchaser was to take the risk of the quantity stated in the contract. But the intention of the parties to an agreement when it has been reduced to writing is to be ascertained from the writing alone, if there is no uncertainty in the meaning of the language employed, and evidence of prior oral negotiations or stipulations at variance with the written agreement are inadmissible for the purpose of construction. The contract may be read in the light of surrounding circumstances, and if the language employed is uncertain and ambiguous, they may afford a key to the meaning and intention of the parties, but they cannot be used to contradict what is expressed. But the rule does not confine the court in construing a writing to the very instrument in question. Other contemporaneous writings between the parties relating to the same subject-matter are admissible in evidence to explain or qualify the agreement before the court. * * * The contract of October 9, 1868 is, therefore, to be regarded as a contract to sell the land embraced therein by the acre, at the price specified. The land contains but 48 acres and 27 perches. By mistake induced in whole or in part by the untrue, though not fraudulent, representation of the defendant, the plaintiff has paid for 56 and $15/100$ acres, and the mistake was not known to him until after the conveyance was executed. It is very just that under these circumstances the plaintiff should recover back the money paid for the land in excess of the actual quantity, and the law, we think, justifies the recovery in this case."

[2] A suggestion is made that, a surveyor having been agreed upon to ascertain the actual number of acres of upland to be conveyed, he became thereby an arbitrator or referee, and that in the absence of fraud his decision was conclusive upon the parties. But there was no controversy to refer or to arbitrate. No judicial functions were bestowed upon the surveyor. He had a mere ministerial duty to perform, namely, to ascertain the facts. He was like the accountant in Kelly v. Crawford, 5 Wall. 785, 18 L. Ed. 562, where the parties agreed that he should examine the books of account and ascertain from them the amount due. Mr. Justice Field said:

"There was no dispute or controversy between the parties to be submitted to arbitration; nor was anything to be submitted to the judgment or discretion of Quigg. The books of account of the defendants were to determine the amount due; about these there was no controversy. The only duty of Quigg was to examine them as an accountant and to state what they exhibited."

And so in Hale v. Handy, 26 N. H. 206, where, under a contract for the sale of logs, the timber was to be measured by a person named, evidence to impeach said person's measurements was objected to, but the court upon appeal said:

"We do not consider him as occupying the position of a referee, in the ordinary sense of that word. It is true he must, to a certain extent, have exer-

cised his judgment, for it is difficult to suppose a case where that must not be done. But his duty was ministerial rather than judicial in its character. He was to measure a quantity of logs as firewood is usually measured, and to hold that he was invested with the powers of an arbitrator would be to give him a character which, we think, the parties never intended."

No such quality of final arbitration was permitted to the survey of the surveyors in the cases in this state cited supra. The law of the case, therefore, seems to us to be settled in favor of the plaintiff, and the sole question open to be that of fact, namely, how many acres of land was contained in the parcel of upland, and that depended upon where the high-water mark was located.

[3] The ancient rule of the common law is that the title of owners of land bounded by the sea or by navigable rivers where the tide ebbs and flows extends to ordinary high-water mark only. This is the settled rule in New Jersey, where the land conveyed by the instruments under consideration was located. Arnold v. Mundy, 6 N. J. Law, § 1, 10 Am. Dec. 356; Gough v. Bell, 22 N. J. Law, 441; New Jersey Zinc & Iron Co. v. Morris Canal & Banking Co., 44 N. J. Eq. 398, 15 Atl. 227, 1 L. R. A. 133; Yard v. Ocean Beach Ass'n, 49 N. J. Eq. 306, 24 Atl. 729; Ocean City Ass'n v. Schriver, 64 N. J. Law 550, 46 Atl. 690, 51 L. R. A. 425. These cases were admitted in evidence.

In the New Jersey Zinc & Iron Co. Case, supra, the court said:

"A person acquiring title to land abutting on a navigable stream takes title only to the high-water line, and that line is limited by the outflow of the medium high tide between the spring and neap tides."

And in Ocean City Ass'n v. Schriver, supra, the court said:

"The cases and text-books have so uniformly adopted the principle that the line of ordinary high tide at the time of the conveyance 'governs and decides the question as between vendor and vendee' that further citation is unnecessary."

The surveyor whose survey was in question in the case at bar was not put upon the stand by the defendant to explain or justify his measurements. The plaintiff produced a number of witnesses, and established the ordinary high-water mark as of the time of the conveyance, and in conformity with his claim, by satisfactory and preponderating evidence. The determination of this line, and consequently the actual amount of upland conveyed, was, under the pleadings and upon the proof, for the jury. The jury resolved the question, as it seems to us, in accordance with the evidence, and the weight thereof in favor of the plaintiff. We have examined all of the questions argued and submitted by counsel, but find no reason to disturb this judgment.

The judgment and order should therefore be affirmed, with costs and disbursements to the respondent. All concur.